IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARIO APODACA COYAZO,

    Plaintiff,

  v.            Civ. No. 21-583 KK

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

    Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Mario Apodaca Coyazo's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 21), filed January 27, 2022. On April 29, 2022, the Acting Commissioner of the Social Security Administration ("Commissioner") filed a response, and on May 13, 2022, Mr. Coyazo filed a reply. (Docs. 25, 31.) Having meticulously reviewed the entire record and the relevant law, being otherwise sufficiently advised, and for the reasons set forth below, the Court finds that Mr. Coyazo's motion is well-taken and should be GRANTED.

## I. BACKGROUND AND PROCEDURAL HISTORY

Mr. Coyazo filed this action under 42 U.S.C. § 405(g), seeking reversal of the Commissioner's decision denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act. (Doc. 21 at 1-3.) Mr. Coyazo is a high school graduate who worked as a natural gas technician for over 30 years. (AR 40-41, 43, 103-04.[2]) Now 62, Mr. Coyazo suffers

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 33.)

[2] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on October 22, 2021. (Doc. 14.)

from the severe impairments of degenerative disc disease of the lumbar spine, degenerative joint disease of the left hip, arthralgias, gastroesophageal varices, obesity, hypertension, cirrhosis of the liver, hepatic encephalopathy,[3] major depressive disorder, generalized anxiety disorder, psychosis, post-traumatic stress disorder ("PTSD"), bipolar disorder, and panic disorder. (AR 17, 40, 827, 829-32.)

## A. Procedural History

Mr. Coyazo filed his claim for DIB on February 5, 2016, alleging disability beginning on January 1, 2013, due to cirrhosis, arthritis, depression, esophageal varices, fatigue, schizophrenia, poor memory, and inability to be around people. (AR 114-16, 313.) On June 24, 2016, he amended his alleged onset date to January 1, 2012. (AR 315.) His date last insured is December 31, 2017, (AR 17), and thus the period under consideration is from January 1, 2012, to December 31, 2017.

Mr. Coyazo's claim for DIB was denied initially and upon reconsideration. (AR 114, 147, 175-78, 180-85.) On June 6, 2017, he requested a hearing before an Administrative Law Judge ("ALJ"), which was held in person on September 13, 2018. (AR 34-79, 188-89.) At the hearing, at which Mr. Coyazo was represented by counsel, Mr. Coyazo and a vocational expert ("VE") testified. (AR 34-79.) On July 11, 2019, ALJ Lillian Richter issued an unfavorable decision. (AR 151-64.) The Appeals Council subsequently granted Mr. Coyazo's request for review and, on April 17, 2020, remanded the case to the ALJ. (AR 172-73.)

ALJ Richter held a second hearing by telephone on September 24, 2020. (AR 80-113.) Mr. Coyazo was again represented by counsel, and both he and a VE testified. (AR 80-113.) On

---

[3] Hepatic encephalopathy is a "[l]oss of brain function [that] occurs when the liver is unable to remove toxins from the blood." https://medlineplus.gov/ency/article/000302.htm (last accessed Nov. 29, 2022). Symptoms may include changes in sleep patterns, thinking, personality, mood, or behavior; confusion; forgetfulness; poor concentration or judgment; agitation; excitement; disorientation; drowsiness; slurred speech; and, slowed or sluggish movement. *Id.* "Chronic forms of the disorder often continue to get worse and come back." *Id.*

January 19, 2021, the ALJ issued a second unfavorable decision. (AR 15-27.) The Appeals Council

denied Mr. Coyazo's subsequent request for review on May 6, 2021, and this appeal followed.

(AR 1-3; Doc. 1.)

### B. Evidence regarding Mr. Coyazo's Psychiatric Conditions and Symptoms[4]

#### 1. Medical Record Evidence

Mr. Coyazo received treatment from Scott Jeansonne, D.O., a family practitioner at First

Choice Community Health ("FCCH") Belen, on 17 occasions between December 18, 2012, and

September 25, 2017. (AR 454-57, 524-35, 552-53, 570-73, 640-42, 646-51, 688-89.) *Inter alia*,

Dr. Jeansonne treated Mr. Coyazo for psychiatric conditions and symptoms including low energy,

fatigue, depression, depression with psychotic features, major depressive disorder, auditory

hallucinations, hypervigilance, paranoia with mild delusions of persecution, psychosis, sleep

trouble, hepatic encephalopathy associated with cirrhosis, memory issues, "brain fog," inability to

concentrate or focus, and suicidal ideation. (AR 454, 457, 524, 531, 534-35, 552, 570-73, 640,

646-49, 688-89.) Dr. Jeansonne ordered laboratory tests to monitor Mr. Coyazo's liver function,

(AR 454-55, 524-25, 535, 553, 570, 640, 647, 649), and prescribed medications to treat Mr.

Coyazo's cirrhosis and psychiatric conditions and symptoms, including sertraline,[5] quetiapine,[6]

---

[4] In his motion and reply, Mr. Coyazo limits his arguments to the ALJ's consideration of his psychiatric conditions and symptoms. (Docs. 21, 31.) Thus, although the Court has reviewed the entire record, it will limit its discussion to the record evidence relevant to these conditions and symptoms.

[5] Sertraline, or Zoloft, is used to treat depression, obsessive-compulsive disorder, panic attacks, PTSD, and social anxiety disorder. https://medlineplus.gov/druginfo/meds/a697048.html (last accessed Nov. 29, 2022).

[6] Quetiapine, or Seroquel, is used to treat the symptoms of schizophrenia, bipolar disorder, and depression. https://medlineplus.gov/druginfo/meds/a698019.html (last accessed Nov. 29, 2022).

lactulose,[7] and rifaximin.[8] (AR 524, 526, 532, 535, 552-53, 570-73, 646-49, 688-89.) In addition, Mr. Coyazo saw family practitioner Caline Cone, M.D., at FCCH South Broadway in Albuquerque on October 23, 2014. (AR 539-40.) Dr. Cone noted Mr. Coyazo's positive depression screen as well as occasional chest pain that Mr. Coyazo "attribute[d] to worry about his family." (AR 539.) She prescribed sertraline for his psychiatric symptoms. (AR 539-40.)

In addition to receiving psychiatric treatment from his family practitioners, Mr. Coyazo also received treatment for hepatic encephalopathy from Margaret Lieberman, M.D., a gastroenterologist at the University of New Mexico Hospital, during the relevant period. (AR 585-88, 658-60, 702-04.) In July 2016, Dr. Lieberman noted Mr. Coyazo's "complain[ts] of forgetfulness, irritability, hesitancy in speech[,] and severe fatigue," (AR 658), and observed "some hesitancy in his speech pattern" and that "he did at one point forget what he had been talking about[.]" (AR 659.) She assessed that his "[h]epatic encephalopathy remains problematic despite maximal tolerated therapy[.]" (AR 659.) In September 2016, Dr. Lieberman wrote that Mr. Coyazo's hepatic encephalopathy "[a]ppear[ed] to be adequately controlled on rifaximin and lactulose, but anxiety and depression also appear[ed] to be contributing to his irritability and forgetfulness." (AR 586.) She referred him to behavioral health services. (AR 586.) In March 2017, Dr. Lieberman assessed that Mr. Coyazo's "[f]orgetfulness remains a problem on rifaximin and the maximum tolerated dose of lactulose." (AR 703.) Imaging throughout the relevant period confirmed Mr. Coyazo's diagnosis of liver cirrhosis. (AR 541, 547, 550, 626-27, 685-86, 729-30.)

---

[7] Lactulose is "used to reduce the amount of ammonia in the blood of patients with liver disease." https://medlineplus.gov/druginfo/meds/a682338.html (last accessed Nov. 29, 2022).

[8] Rifaximin, or Xifaxan, "is used to prevent episodes of hepatic encephalopathy (changes in thinking, behavior, and personality caused by a build-up of toxins in the brain in people who have liver disease) in adults who have liver disease." https://medlineplus.gov/druginfo/meds/a604027.html (last accessed Nov. 29, 2022).

Mr. Coyazo also received services from mental health care providers during the relevant period. Mr. Coyazo received counseling from Mary Helen Short, L.C.S.W., at FCCH Belen, at six appointments between January 28 and May 25, 2016. (AR 554-62, 664.) On these occasions, LCSW Short diagnosed Mr. Coyazo with depression or dysthymia. (AR 554-62, 664.) She noted abnormal mental status examination findings including attention-seeking, ingratiating, condescending, seductive and overly familiar behavior, depressed mood, tearful, restricted affect, tangential, preoccupied, perseverative thought, and poor, incongruent perceptions, judgment, and insight. (AR 554-62, 664.) She also noted that Mr. Coyazo "had difficulty when making lists and establishing priorities," "became overwhelmed [and] confused but responded to redirection," "frequently … [went] off on tangents," "monopolize[d] conversation," and "require[d] more support than [his daughters could] provide." (AR 554, 558, 560, 664.)

On September 22, 2016, Mr. Coyazo saw Yolanda Morales, Ph.D., at the University of New Mexico Hospital's Outpatient Behavioral Health. (AR 617-19.) She noted Mr. Coyazo's desire to "get[] control over … his anger," which caused him to "stay by himself," and his reports of anxiety, irritability, fatigue, decreased appetite, and childhood sexual abuse. (AR 617.) Dr. Morales diagnosed Mr. Coyazo with "[dep]ression secondary to medical condition" and referred him to therapy. (AR 618.)

Jean Lisiak, L.C.S.W., at Rio Grande Counseling & Guidance Services ("RGCGS") performed a diagnostic evaluation and psychosocial assessment of Mr. Coyazo on September 28, 2016, at which she diagnosed him with PTSD. (AR 809-19.) Mr. Coyazo then saw Nicole Gilkey, L.C.S.W., at RGCGS at 36 appointments between October 6, 2016, and December 21, 2017. (AR 802-04, 807, 834-35, 838-39, 841-43, 845-49, 851-53, 855, 857, 859, 861-62, 864, 867, 870-72, 874, 876-81.) LCSW Gilkey recorded Mr. Coyazo's reports of trouble sleeping, intrusive

memories, lack of motivation, anxiety, mood instability, bipolar symptoms, guilt, shame, isolation, conflict with his daughters, depressed, tearful mood, cycles of depression and decreased energy, sleeping too little or too much, lack of appetite, unfinished projects, trouble keeping up with thoughts, memory issues, fatigue, irritability, decreasing time from mania to depression, anger, and sadness, and also noted that he "misremembers things and ends up missing appointments." (AR 835, 838-39, 842, 845-46, 848, 851-53, 855, 857, 862, 872, 874, 876-77, 879, 881.) At 19 appointments, she noted abnormal mental status examination findings including depressed, excited, anxious, irritable, agitated, and fearful mood, distracted attention, restless motor activity, pressured and tangential speech, and fair self-control, judgment, and insight. (AR 835, 838-39, 842, 845, 852-53, 855, 857, 859, 862, 864, 872, 874, 877-81.) In August 2017, LCSW Gilkey "confronted" Mr. Coyazo "regarding his tendency to avoid therapy during states of depression and attend when he felt well." (AR 862.)

Mr. Coyazo also saw Blake F. White, Ph.D., at RGCGS, for psychiatric evaluation and medication management on five occasions between June 12, 2017, and December 4, 2017. (AR 820-32.) On evaluation in June 2017, Dr. White noted Mr. Coyazo's PTSD, trouble falling asleep, weight change, poor short-term and recent memory, decreased concentration, low energy, decreased libido, flashbacks, and history of anger issues and violence. (AR 820.) He noted Mr. Coyazo's reports of depression, anxiety, insomnia, memory issues, agoraphobia, anger, poor self-esteem, social withdrawal, hallucinations, suicidal ideation, and mood dysregulation. (AR 825, 827.) He also made abnormal mental status examination findings, *i.e.*, unkempt appearance, limited, flat affect, anxious, depressed, apathetic mood, loose thought process, and fair self-concept, judgment, and impulse control. (AR 827.) He diagnosed Mr. Coyazo with recurrent, severe major depressive disorder, with a rule-out for psychotic symptoms. (AR 827.)

In July 2017, Dr. White noted Mr. Coyazo's reports of trouble focusing, emotional lability, insomnia, and loneliness, and that quetiapine was too sedating. (AR 832.) On mental status examination, he observed Mr. Coyazo's depressed mood and dysphoric affect. (AR 832.) He discontinued quetiapine, prescribed sertraline and hydroxyzine,[9] and added PTSD to Mr. Coyazo's diagnoses. (AR 832.) In August 2017, Dr. White noted Mr. Coyazo's reports of "feel[ing] really good," with "much less" withdrawal and agoraphobia and "only [one] incident of feeling angry [and] aggressive." (AR 831.) On mental status examination, he observed Mr. Coyazo's euphoric affect, pressured speech, and fair perception, insight, judgment, and impulse control. (AR 831.) He added "[rule out] bipolar disorder" to Mr. Coyazo's treatment plan. (AR 831.)

In September 2017, Dr. White recorded Mr. Coyazo's report that he "occasionally gets depressed but uses meditation," and noted that he "[d]enies manic episodes, but thinks he's OCD." (AR 830.) Dr. White documented normal mental status examination findings except for fair insight at this appointment. (AR 830.) He assessed that Mr. Coyazo "describes [obsessive-compulsive disorder symptoms]" and continued Mr. Coyazo's prior prescriptions and diagnoses. (AR 830.) And in December 2017, Dr. White noted Mr. Coyazo's report that he was "feeling surprisingly well," recorded normal mental status examination findings except for fair perception, insight, judgment, and impulse control, continued Mr. Coyazo's prior prescriptions, and revised his diagnosis of recurrent major depressive disorder from severe to moderate. (AR 829.)

In addition to receiving psychiatric treatment from the foregoing providers, Mr. Coyazo underwent two consultative psychological examinations during the relevant period. The first was with Shari Spies, Psy.D., on December 18, 2013. (AR 475-77.) Dr. Spies wrote that, according to

---

[9] Hydroxyzine, or Vistaril, is "used alone or with other medications … to relieve anxiety and tension." https://medlineplus.gov/druginfo/meds/a682866.html (last accessed Nov. 30, 2022).

Mr. Coyazo, he felt "low, inadequate, and worthless," could not work, wanted to sleep all the time, had regularly had "extreme anxiety attacks" for the past month, neglected his personal hygiene at times, and was "frightened" because his "poor memory" was "getting worse." (AR 475-76.) He reported good relationships with his family and three previous wives but also described alcohol and substance abuse starting at 13 and ending with his cirrhosis diagnosis. (AR 475-76.) Dr. Spies recorded normal examination findings except that Mr. Coyazo could recall only one out of three words after three minutes, could not name the United States Vice President, and reported his mood as "excited." (AR 476.) She listed her diagnostic impressions as alcohol, cocaine, and cannabis dependence and adjustment disorder with mixed anxiety and depressed mood. (AR 476.)

Mr. Coyazo's second consultative psychological examination was with Michael P. Emery, Ph.D., on March 1, 2017. (AR 634-37.) According to Dr. Emery, Mr. Coyazo "disclosed readily" but his "narrative was interspersed with self-evaluating reflections and reminiscent tangents and treatment history was difficult to pin down." (AR 634.) Dr. Emery noted Mr. Coyazo's reports of anger, anxiety, diminishing memory, "skewed circadian schedule" with nighttime insomnia and daytime sleep, alcohol and substance abuse from high school to 2012, nightmares, night terrors, night sweats, panic symptoms, intrusive memories, intrusive and ruminative thoughts, isolation, avolition, tearfulness, feelings of guilt, inadequacy, hopelessness, helplessness, and worthlessness, difficulty concentrating, "thoughts of not being alive," and feelings of "energy and 'exhilaration' that rapidly give way" to irritability, anger, and guilt. (AR 634-36.) On examination of Mr. Coyazo, Dr. Emery made abnormal findings including mild to moderate "[m]anifest" anxiety; "frequent tangents"; perseveration; fair judgment and insight; inability to remember any objects after three minutes, what he ate for supper the night before, or his mother's birthday; mistakes counting by twos, performing serial sevens, multiplying single digits, and identifying the number of weeks in

8

the year and the capital of Italy; and, difficulty with abstraction. (AR 636.) Dr. Emery diagnosed

Mr. Coyazo with PTSD with generalized anxiety, panic disorder, and intruding rumination,

atypical mood disorder, depressed mood and irritability, and alcohol and cocaine use disorders in

sustained full remission. (AR 637.)

The record also includes evidence of Mr. Coyazo's treatment for psychiatric conditions

and symptoms after his date last insured of December 31, 2017. This includes medical records

regarding Mr. Coyazo's:  (1) discharge from RGCGS in January 2018 because he missed his last

two appointments and his attendance had been "consistently inconsistent,"[10] (AR 797-800); (2)

counseling appointments at Elevation Counseling with LCSW Gilkey from February to September

2018, and with Michelle Morgan, L.P.C.C., from July to November 2019, (AR 745-88, 938-62);

and, (3) visits to Dr. Cone and Lariza Rosas Valdez, P.A., at FCCH, between July 2018 and April

2020, (AR 680-82, 885-87, 897-902, 926-31).

### 2.   Hearing Testimony, Reports, and Statement

In a March 2016 Adult Function Report, Mr. Coyazo indicated that he:  lived alone; needed

help caring for his dog; became "drained" caring for his house and yard; could not use the stove

or "take people for long"; ate dinner at his daughter's house with "a little participation"; panicked

when he went out alone; could not pay bills, handle a savings account, or use a checkbook; could

follow simple, basic written instructions and spoken instructions if not extensive but could only

---

[10] In May 2019, counsel requested a supplemental hearing to allow Mr. Coyazo to explain his no-shows and cancellations at RGCGS, because "transportation and memory issues prevented him from attending these appointments." (AR 435.) Although there is no indication that this hearing was ever held, Mr. Coyazo did receive a second hearing in September 2020 following the Appeals Council's remand, (AR 172-73), at which he testified that his "bad" concentration in 2017 caused him problems with keeping his health care appointments and also with remembering whether he had taken his medications. (AR 95-96.) The ALJ did not explain why she apparently rejected this testimony when she "[w]eigh[ed] against [Mr. Coyazo] … that he was noncompliant in taking his medication as prescribed and attending scheduled medical appointments." (AR 24.)

pay attention for about 10 minutes; got along well with authority figures "if [he didn't] have to be around too long"; and, could not handle stress or changes in routine. (AR 382-88.) In an August 2016 "Disability Report – Appeal," Mr. Coyazo indicated that hepatic encephalopathy caused him to forget to take medications, bathe, and turn off burners and faucets. (AR 405.)

At both of his hearings, Mr. Coyazo testified that he stopped working, *inter alia*, because he "was forgetting a lot of things" at work, which posed a "safety issue." (AR 43-44, 60-61, 86-89.) He added that he was given verbal warnings for forgetting things "[q]uite often." (AR 57-58.) Mr. Coyazo also testified that he was "continually angry," could not calm upset customers, and had trouble working with "[his] people." (AR 44, 86-89.) According to Mr. Coyazo, he was reprimanded for "pushing [a coworker] back" after the coworker pushed him, and he and the coworker "c[a]me to fists" when he went to the coworker's house a few weeks later. (AR 45-46.)

Mr. Coyazo testified that he has trouble remembering to pay bills, keep healthcare appointments, take medications, and turn off the stove and faucet. (AR 53, 96-97.) He also stated that he has trouble falling asleep. (AR 54.) According to Mr. Coyazo, he does not feel he can "be around people because of [his] anger" and avoids people, including family members. (AR 56, 98-99.) Mr. Coyazo stated that he "can go off on tangents [as] part of [his] encephalopathy," and that he "forget[s] where [he's] at" in conversations. (AR 93, 95.) He indicated that his liver medications "clear [his] brain," but when they do not entirely remove toxins in his blood, his mind becomes unclear. (AR 100-01.)

In a September 6, 2018 sworn statement, Mr. Coyazo's daughter Michelle Coyazo attested that she was "currently not on good terms with" her father, but when she was she helped him with transportation, water, money, and cooking. (AR 732.) She described Mr. Coyazo as "very forgetful and easily confused," with "a lot of anxiety and depression." (AR 732.) According to Ms. Coyazo,

her father gets angry, yells, and isolates, and "forget[s] important tasks that he needs to do." (AR 732.)

### 3.  Medical Source Opinions and Prior Administrative Medical Findings

On December 18, 2013, consultative examiner Dr. Spies opined that Mr. Coyazo is moderately limited in the abilities to:  (a) adapt to changes in the workplace; (b) be aware of normal hazards and react appropriately; (c) interact with the public, coworkers, and supervisors; (d) carry out instructions; (e) attend and concentrate; (f) work without supervision; and, (g) understand and remember detailed or complex instructions. (AR 477.)

On June 21, 2016, non-examining state agency consultant Thomas VanHoose, Ph.D., found that Mr. Coyazo has "sustained concentration and persistence limitations" and is moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 125-26.) He added that Mr. Coyazo

> retains the capacity to understand, remember, and carry out detailed instructions; attend/concentrate for extended periods with usual breaks; exercise reasonable judgment with work tasks; interact appropriately with others, and complete a routine workday with normal supervision.

(AR 126.)

On March 1, 2017, consultative examiner Dr. Emery opined that Mr. Coyazo's memory and concentration are "moderate[ly]" impaired; his understanding is "[i]ntact"; his "[s]ocial function is moderately to markedly impaired due to anger and anxiety"; and, his "[o]verall adaptation is markedly impaired." (AR 636.)

Finally, on March 21, 2017, non-examining state agency consultant Aroon Suansilppongse, M.D., found that Mr. Coyazo

> is able to carry out simple instructions. His anxiety and depressive reaction as well as pain/fatigue would interfere with his ability for sustained concentration and

persistence or for task completion. However, the claimant would be able to complete tasks at an acceptable pace.

(AR 142-43.) Dr. Suansilppongse also found that Mr. Coyazo's

social avoidance and infrequent episodes of irritability, panic attacks, anger, crying spells and impulsive behavior would occasionally interfere with his ability to interact appropriately with supervisors, coworkers or the public. However, he would be able to complete tasks with infrequent contact with others.

(AR 143.) Dr. Suansilppongse further found that Mr. Coyazo's "transient cognitive dysfunction and polysubstance use would occasionally interfere with his ability to set realistic goals or make plans independently of others." (AR 143.) Finally, Dr. Suansilppongse added that Mr. Coyazo "has mental capacity for simple work[-]related activity (1-2 steps tasks) with infrequent contact with coworkers and the public." (AR 143.)

### C.  The ALJ's Decision

In her decision, the ALJ applied the Commissioner's five-step evaluation process.[11] (AR 15-27.) At step one, the ALJ determined that Mr. Coyazo did not engage in substantial gainful activity from his alleged onset date through his date last insured. (AR 17.) At step two, the ALJ found that Mr. Coyazo has the severe impairments of degenerative disc disease of the lumbar spine,

---

[11] The five-step sequential evaluation process requires the ALJ to determine whether:

(1)     the claimant engaged in substantial gainful activity during the alleged period of disability;
(2)     the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
(3)     any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
(4)     the claimant can return to his past relevant work; and, if not,
(5)     the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.

20 C.F.R. § 404.1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

degenerative joint disease of the left hip, arthralgias, gastroesophageal varices, hepatic encephalopathy, obesity, cirrhosis of the liver, hypertension, depression, adjustment disorder with mixed anxiety and depressed mood, generalized anxiety disorder, psychosis, PTSD, bipolar disorder, and panic disorder. (AR 17.) The ALJ also determined that Mr. Coyazo's alcohol and cocaine dependence in remission, cannabis dependence, hepatitis C, and prostatitis are non-severe because "the medical evidence fails to support that these conditions result in more than minimal limitations on [Mr. Coyazo's] ability to perform basic work activities." (AR 18.) She further found that Mr. Coyazo's "alleged disabling left shoulder and left hip pain are not a [sic] medically determinable impairments." (AR 18.) At step three, the ALJ found that Mr. Coyazo's impairments, alone or in combination, do not meet or medically equal the severity of one of the Listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 18-20.)

At step four,[12] the ALJ found that during the relevant period, Mr. Coyazo had the residual functional capacity ("RFC")

> to perform medium work as defined in 20 CFR 404.1567(c) except he could frequently stoop and kneel, occasionally crouch and crawl, occasionally balance, and could never climb ladders, ropes or scaffolds. The claimant could frequently reach with the left upper extremity. The claimant could perform simple, routine work, could understand and communicate simple information, could have occasional interaction with supervisors and coworkers and no interaction with members of the public. The claimant could make simple work related decisions in a workplace with few changes in the routine work setting.

---

[12] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is the claimant's residual functional capacity. *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given his residual functional capacity. *Id.* A claimant who can perform his past relevant work is not disabled. 20 C.F.R. § 404.1520(f).

13

(AR 20-21.) The ALJ further found that Mr. Coyazo was unable to perform his past relevant work. (AR 26.)

At step five, the ALJ found that, through his date last insured, there was other work Mr. Coyazo could have performed that existed in significant numbers in the national economy. (AR 26-27.) In making this determination, the ALJ relied on VE testimony that a hypothetical individual of Mr. Coyazo's age and with his education, work experience, and assigned RFC could have performed the representative occupations of laundry bundler and janitor. (AR 26-27.) The ALJ therefore concluded that Mr. Coyazo "was not under a disability, as defined in the Social Security Act, at any time from January 1, 2012, the alleged onset date, through December 31, 2017, the date last insured[.]" (AR 27.)

## II.  STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo. Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than

14

a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### III. DISCUSSION

Mr. Coyazo argues that, in assessing his RFC, the ALJ improperly picked and chose among Dr. Spies' opinions, failing to include or adequately explain why she discounted opined limitations related to hazards, carrying out instructions, attention and concentration, and working without supervision. (Doc. 21 at 11-16.) Mr. Coyazo also argues that the ALJ improperly assessed Dr. Emery's opinions by failing to explain which opinions she rejected and why, and by failing to include opined limitations relating to social functioning and adaptation. (*Id.* at 16-24). For the reasons discussed below, the Court finds that remand is warranted because, in assessing Mr.

Coyazo's RFC, the ALJ did not adequately explain:  (1) her failure to incorporate Dr. Spies'
opinion regarding Mr. Coyazo's moderately limited ability to carry out instructions; or, (2) her
apparent rejection of Dr. Emery's opinions regarding Mr. Coyazo's moderate to marked social and
marked adaptive limitations.[13]

### A.  The ALJ did not adequately explain her failure to incorporate Dr. Spies' opinion regarding Mr. Coyazo's limited ability to carry out instructions.

"[W]hen assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each
[medical source] opinion and why." *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016).
Also, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator
must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7 (Jul. 2, 1996).
Medical source opinions must be weighed using the factors set forth in 20 C.F.R. § 404.1527(c),[14]
*i.e.*, (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5)
specialization, and (6) other factors. Of course, "[n]ot every factor … will apply in every case,"
SSR 06-03P, 2006 WL 2329939, at *5 (Aug. 9, 2006), and the ALJ is not required to expressly
apply every factor in weighing an opinion. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir.
2007). Nevertheless, the ALJ must provide "good reasons" for the weight she gives a medical
source opinion, and where she fails to do so, the case must be remanded. *Frantz v. Astrue*, 509
F.3d 1299, 1302-03 (10th Cir. 2007); *Oldham*, 509 F.3d at 1258; *Haga v. Astrue*, 482 F.3d 1205,
1207-09 (10th Cir. 2007); *see also Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) (ALJ

---

[13] The Court will not address Mr. Coyazo's remaining claims of error because they may be affected on remand.
*Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

[14] The SSA uses a revised framework for the evaluation of medical source opinions in claims filed on or after March
27, 2017. 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. §§ 404.1527, 404.1520c. However,
because Mr. Coyazo filed his claim for DIB in 2016, (AR 114, 313-14), the prior evidentiary framework applies here.

must provide "adequate reasons" for rejecting significantly probative medical evidence concerning claimant's RFC).

In this case, Dr. Spies opined that Mr. Coyazo's "ability to carry out instructions" is "moderately limited," as is his "ability to understand and remember detailed or complex instructions." (AR 477.) Notably, Dr. Spies limited her opinion regarding Mr. Coyazo's ability to "understand and remember" instructions to "detailed or complex instructions," but included no such limitation with respect to her opinion regarding his ability to "carry out instructions." (AR 477.) Thus, both on its face and in context, Dr. Spies' opinion regarding Mr. Coyazo's moderately limited ability to carry out instructions applies to all instructions, including simple ones.

The ALJ collectively assigned Dr. Spies' opinions "significant weight," stating that they are "generally supported by her benign findings upon examination" and "generally consistent with evidence demonstrating that while the claimant experienced some limitations from his mental health impairments, his condition improved with medication and treatment." (AR 25.) Nevertheless, the ALJ did not include in Mr. Coyazo's assigned RFC any limitation on his ability to carry out simple instructions. (AR 21.) Thus, and given that "a moderate impairment is not the same as no impairment at all," *Haga*, 482 F.3d at 1208, the assigned RFC conflicts with Dr. Spies' opinion that Mr. Coyazo is moderately limited in this ability, and the ALJ was required to explain why she rejected the opinion. SSR 96-8P, 1996 WL 374184 at *7.

However, the ALJ's stated reasons for the weight she gave Dr. Spies' opinions do not adequately explain her failure to account for the examiner's opinion regarding Mr. Coyazo's moderately impaired ability to carry out simple instructions. First, although the ALJ referred to Dr. Spies' "benign findings upon examination," (AR 25), elsewhere in her decision she acknowledged that Mr. Coyazo "exhibited difficulty with delayed recall" during Dr. Spies'

examination, (AR 23), recalling only one of three words after three minutes and forgetting the

United States Vice President's name. (AR 476.) Second, there is significantly probative medical

record evidence that, even after receiving "medication and treatment," Mr. Coyazo continued to

experience "limitations from his mental health impairments" likely to limit his ability to carry out

instructions. (AR 25.) For example:

- In August 2015, Dr. Jeansonne noted Mr. Coyazo's reports of auditory hallucinations, hypervigilance, paranoia, and trouble sleeping, (AR 534-35);

- In November 2015, Dr. Jeansonne noted Mr. Coyazo's report of "new memory issues" and his "likely hepatic encephalopathy," (AR 526);

- In January 2016, Dr. Jeansonne noted Mr. Coyazo's reports of depression and "some issues with brain fog even with adequate dosing" of lactulose, (AR 524);

- In January 2016, LCSW Short observed Mr. Coyazo's depressed and tearful mood, (AR 562);

- In February 2016, LCSW Short noted Mr. Coyazo's report of feeling depressed and sad a majority of the time and observed that he "had difficulty when making lists and establishing priorities" and "became overwhelmed [and] confused" and his thought "seemed tangential and … preoccupied," (AR 558, 60);

- In March 2016, LCSW Short noted Mr. Coyazo's depressed mood, tangential and perseverative thought, and poor or incongruent perceptions, judgment, and insight, (AR 554, 556);

- In April 2016, Dr. Jeansonne noted Mr. Coyazo's reports of depression, inability to concentrate or focus, and suicidal ideation, and assessed worsened encephalopathy (AR 552-53);

- In July 2016, Dr. Lieberman noted Mr. Coyazo's complaints of "forgetfulness, … hesitancy in speech and severe fatigue," observed "some hesitancy in his speech pattern" and that "he did at one point forget what he had been talking about," and concluded that "[h]epatic encephalopathy remains problematic despite maximal tolerated therapy," (AR (AR 658-59);

- In September 2016, Dr. Lieberman observed that Mr. Coyazo's "anxiety and depression … appear to be contributing to his … forgetfulness," (AR 586);

- In October 2016, LCSW Gilkey observed Mr. Coyazo's depressed, anxious mood, and noted his reports of trouble sleeping, intrusive memories, lack of motivation, and anxiety, (AR 857);

- In November 2016, LCSW Gilkey observed Mr. Coyazo's distracted attention, pressured speech, and depressed mood, and noted his reports of trouble sleeping and mood instability, (AR 852, 853, 855);

- In January 2017, LCSW Gilkey observed Mr. Coyazo's excited mood and pressured speech and noted his report of needing little sleep, (AR 845);

- In February 2017, LCSW Gilkey observed Mr. Coyazo's pressured speech and disheveled appearance and noted his reports of mood instability, a monthly cycle of depression and decreased energy, and sleeping too much or too little, (AR 839, 842);

- In March 2017, LCSW Gilkey observed Mr. Coyazo's distracted attention, pressured speech, depressed mood, and fair judgment and insight, and noted his reports of unfinished projects, lack of sleep and appetite, and trouble keeping up with his thoughts, (AR 835, 838);

- In March 2017, Dr. Lieberman assessed that Mr. Coyazo's "[f]orgetfulness remains a problem on rifaximin and the maximum tolerated dose of lactulose," (AR 703);

- In March 2017, Dr. Emery observed Mr. Coyazo's mild to moderate "[m]anifest" anxiety; "frequent tangents"; perseveration; fair judgment and insight; inability to remember objects after three minutes, what he ate for supper the night before, or his mother's birthday; mistakes counting by twos, performing serial sevens, multiplying single digits, and identifying the number of weeks in the year and the capital of Italy; and, difficulty with abstraction, (AR 635-36);

- In April 2017, LCSW Gilkey observed Mr. Coyazo's depressed, agitated mood and noted his report of trouble sleeping, (AR 880-81);

- In May 2017, Dr. Jeansonne noted Mr. Coyazo's report that "memory has become more of an issue[] recently" and that he had "more issues with completing tasks," (AR 646);

- In May 2017, LCSW Gilkey observed Mr. Coyazo's depressed, fearful mood and fair judgment and noted his reports of fatigue, decreasing time from mania to depression, sadness, and lack of motivation, (AR 877, 879);

- In June 2017, LCSW Gilkey observed Mr. Coyazo's distracted attention, tangential speech, depressed mood, and fair self-control, judgment, and insight, and noted his reports of memory issues, trouble sleeping, constant fatigue, and depression, (AR 872, 874);

- In June 2017, Dr. White observed Mr. Coyazo's unkempt appearance, anxious, depressed, apathetic mood, loose thought process, and fair judgment and impulse control, and noted his reports of trouble falling asleep, poor short-term, recent memory, decreased concentration, low energy, and flashbacks (AR 820, 827);

- In July 2017, Dr. White observed Mr. Coyazo's depressed mood and noted his reports of trouble focusing, emotional lability, and insomnia, (AR 832); and,

- In August 2017, LCSW Gilkey observed Mr. Coyazo's depressed mood, and "confronted [him] regarding his tendency to avoid therapy during states of depression and attend when he felt well," (AR 862).[15]

The ALJ did not discuss why she discounted this significantly probative medical record evidence in weighing Dr. Spies' opinions. (AR 25.)

Nor did the ALJ explain why she discounted other significantly probative evidence supporting Dr. Spies' opinion that Mr. Coyazo is moderately limited in his ability to carry out simple instructions, including evidence that:

- Although Mr. Coyazo could "do simple [and] basic" written instructions and follow spoken instructions "OK, if not extensive," he could only pay attention for "10 minutes or so," (AR 387);

- Mr. Coyazo's daughters helped him with grocery shopping, pet care, meals, transportation, water, and money, (AR 107, 383-84, 386, 635, 732[16]);

---

[15] Moreover, LCSW Gilkey continued to make abnormal mental status exam findings even after Mr. Coyazo's December 31, 2017 date last insured. (*See, e.g.*, AR 745 (on February 15, 2018, LCSW Gilkey noted Mr. Coyazo's "[d]ysphoric" mood and "[t]angential" flow of thought); AR 757 (on April 5, 2018, LCSW Gilkey noted Mr. Coyazo's "[d]isorganized" cognitive functioning, "[d]epressed" mood, and "[i]mpaired" functional status, and "repeatedly redirected [Mr. Coyazo] in order for [him] to complete his thoughts or questions asked of him. [He] would begin one thought and forget what he had previously been stating or doing"); AR 782 (on August 30, 2018, LCSW Gilkey noted Mr. Coyazo's "[d]isorganized" cognitive functioning and "[d]epressed" mood, and that Mr. Coyazo was "experiencing monthly to bimonthly periods of mania … followed by depressed mood … which lasts for … a week to two weeks. [He] struggles to sustain attention regardless of mood.").)

[16] The ALJ gave only "some weight" to Ms. Coyazo's sworn statement, asserting that "the evidence does not support her contention that the claimant requires close proximity to a bathroom or has the inability to remember what to do at work," and citing Dr. Spies' and Dr. Emery's findings of "good immediate recall." (AR 25.) However, Mr. Coyazo's medical records document multiple daily loose stools, (AR 524, 552, 658); and, both Dr. Spies and Dr. Emery observed that Mr. Coyazo's recall after three minutes was poor. (AR 476, 636.) Also, although the ALJ noted that Ms. Coyazo's statement was made about nine months after Mr. Coyazo's date last insured, (AR 25), the foregoing corroborating medical record evidence was generated during the period under consideration.

- There were occasions on which Mr. Coyazo pulled over while driving because he did not remember how to get home, (AR 52);

- Mr. Coyazo sometimes forgot whether he had taken his medications, (AR 53, 588);

- Mr. Coyazo forgot to turn off a burner or faucet on several occasions, (AR 97, 383, 635, 646); and,

- Mr. Coyazo had trouble remembering healthcare appointments and sometimes forgot to attend or cancel them, (AR 96, 529, 874, 900).

For these reasons, in assessing Mr. Coyazo's RFC, the ALJ did not adequately explain why she failed to account for Dr. Spies' opinion that Mr. Coyazo is moderately limited in the ability to carry out simple instructions.

### B. The ALJ failed to adequately explain why she rejected Dr. Emery's opinions regarding Mr. Coyazo's social and adaptive limitations.

In addition, the ALJ failed to adequately explain her apparent rejection of Dr. Emery's opinions regarding Mr. Coyazo's social and adaptive limitations in assessing Mr. Coyazo's RFC. As noted in Section I.B.3., *supra*, Dr. Emery opined that Mr. Coyazo's "[s]ocial function is moderately to markedly impaired due to anger and anxiety" and his "[o]verall adaptation is markedly impaired." (AR 636.) He also opined to other moderate limitations. (AR 636.) The ALJ gave "only some weight" to Dr. Emery's opinions without specifying which ones she rejected in whole or in part. (AR 25.) As explained below, it appears that the ALJ rejected Dr. Emery's opinions regarding Mr. Coyazo's social and adaptive limitations, because she does not appear to have accounted for them in assessing Mr. Coyazo's RFC. However, the ALJ did not adequately explain her rejection of these opinions.

In the context of evaluating a claimant's mental RFC, the agency defines a "moderate" limitation as one where "the individual's capacity to perform the activity is impaired," and a

"marked" limitation as one where "the individual cannot usefully perform or sustain the activity."[17]

POMS DI § 24510.063(B)(2), (3).[18] The Tenth Circuit has found that, in some instances, "an [ALJ]

can account for moderate limitations by limiting the claimant to particular kinds of work activity."

*Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016); *see also Vigil v. Colvin*, 805 F.3d 1199,

1204 (10th Cir. 2015). However, this is not always the case, *Vigil*, 805 F.3d at 1204; *Groberg v.*

*Astrue*, 505 F. App'x 763, 770 (10th Cir. 2012); and, "[u]nless the connection (between the

limitation and the work) is obvious, … the agency must ordinarily explain how a work-related

limitation accounts for mental limitations reflected in a medical opinion." *Parker v. Comm'r, SSA*,

772 F. App'x 613, 616 (10th Cir. 2019). Moreover, this line of cases cannot logically be extended

to marked limitations, because an individual who "cannot usefully perform or sustain [a work]

activity," POMS DI § 24510.063(B)(3), cannot do a job that requires him to perform or sustain

that activity.

---

[17] In the context of evaluating whether a claimant's mental impairment meets a listing, the agency defines "moderate" and "marked" limitations somewhat differently. In that context, a "[m]oderate limitation" means that a claimant's ability to function independently, appropriately, effectively, and on a sustained basis is "fair," and a "[m]arked limitation" means that a claimant's ability to function independently, appropriately, effectively, and on a sustained basis is "seriously limited." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F)(2)(c), (d). Notably, in the context of assessing a mental RFC, a "[m]arked" limitation is the most extensive limitation possible, POMS DI § 24510.063(B), while in the context of evaluating whether an impairment meets a listing, there is a more extensive limitation available, *i.e.*, an "[e]xtreme limitation," which means that a claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F)(2)(e). Dr. Emery's report does not define the terms "moderate" and "marked," (AR 636), but in the Court's view his opinions are more analogous to an assessment of Mr. Coyazo's mental RFC than to a determination of whether Mr. Coyazo's mental impairments meet a listing. The Court therefore uses the definitions listed in POMS DI § 24510.063(B) to review the ALJ's consideration of Dr. Emery's opinions.

[18] The Program Operations Manual System, or POMS, "is a set of policies issued by the Social Security Administration to be used in processing claims." *Anders v. Berryhill*, 688 F. App'x 514, 520 & n.2 (10th Cir. 2017) (quotation marks and brackets omitted). The Court must defer to POMS provisions unless it determines they are arbitrary, capricious, or contrary to law. *Id.*

Here, the limitations in the assessed RFC do not, on their face, adequately account for Dr. Emery's opinions regarding Mr. Coyazo's social and adaptive limitations.[19] With respect to Dr. Emery's opinion regarding Mr. Coyazo's moderate to marked social limitations, the ALJ did restrict Mr. Coyazo to "no interaction with members of the public." (AR 21.) But she also allowed for "occasional interaction with supervisors and coworkers," *i.e.*, up to about two hours of such interaction per eight-hour workday. (AR 21); SSR 96-9P, 1996 WL 374185, at *3 (Jul. 2, 1996). Without further explanation, this does not appear to account for Dr. Emery's opinion regarding Mr. Coyazo's impaired to non-existent ability to interact with others usefully and on a sustained basis.

Likewise, with respect to Dr. Emery's opinion regarding Mr. Coyazo's adaptive limitations, the ALJ did restrict Mr. Coyazo to "simple, routine work … in a workplace with few changes in the routine work setting." (AR 21.) But this does not appear to adequately account for an inability to "plan," "respond to changes," "deal appropriately with mental demands (stress)," "avoid hazards and maintain safe behavior," "follow rules," "adhere to schedules and to time constraints," and "travel" usefully and on a sustained basis. *See* POMS DI 24510.061(B)(4)(a) (listing "[a]daptive functions" of an individual's mental RFC). Nor did the ALJ otherwise explain how the limitations in the assigned RFC accounted for the social and adaptive limitations to which Dr. Emery opined.

Furthermore, the ALJ failed to adequately explain why she discounted Dr. Emery's opinions regarding Mr. Coyazo's social and adaptive limitations. In explaining the weight she assigned Dr. Emery's opinions collectively, the ALJ stated that Mr. Coyazo:  (1) "was able to

---

[19] Notably, the Commissioner argues that the ALJ gave adequate reasons for rejecting these opinions but does *not* argue that the ALJ accounted for them in assessing Mr. Coyazo's RFC. (Doc. 25 at 14-15.)

attend church, socialize with others, and function somewhat outside the home"; and, (2) "was assessed with essentially normal mental status upon examination on multiple occasions, … was completing projects, and … was feeling more clear mentally." (AR 25.) The first set of reasons appear directed to Mr. Coyazo's social abilities and the second to his adaptive ones, and the Court will consider them in that light.

In rejecting Dr. Emery's opinions, the ALJ first asserted that Mr. Coyazo "was able to attend church." (AR 25.) There is a single reference to Mr. Coyazo's church attendance in the 1,040-page record, in LCSW Lisiak's September 28, 2016, diagnostic evaluation. (AR 816.) The entirety of this reference states, "[a]ttends [c]hurch." (AR 816.) Nowhere does the record indicate how often Mr. Coyazo attended church during the relevant period, and there is no evidence that he did so regularly. But, even assuming he did, simple church attendance is too brief, infrequent, and noninteractive to contradict Dr. Emery's opinion that Mr. Coyazo is moderately to markedly impaired in the ability to interact with supervisors and coworkers usefully and on a sustained basis. *See* POMS DI § 24510.057(A) ("Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities [i]n an ordinary work setting, [o]n a regular and continuing basis, and [f]or 8 hours a day, 5 days a week, or an equivalent work schedule.").

The ALJ next explained the weight she gave Dr. Emery's opinions by stating that Mr. Coyazo "was able to … socialize with others." (AR 25.) However, the ALJ did not identify the social interactions to which she referred, which inhibits the Court's review of this proffered reason. "Socializ[ing] with others" encompasses a broad range of activities that might or might not contradict Dr. Emery's opinion regarding Mr. Coyazo's social limitations. Moreover, the ALJ failed to discuss why she apparently discounted evidence that, during the relevant period, Mr. Coyazo:  kept his social interactions brief, (AR 98, 383, 388); frequently isolated himself, (AR 98,

387, 388, 554, 635, 732, 843, 848, 862, 872, 874, 877, 879, 881); struggled to get along with his

daughters and a romantic partner, (AR 89, 98-99, 106, 554, 556, 562, 732, 845, 846, 862); and,

had no close friends. (AR 815.) Absent an explanation for discounting this significantly probative

evidence, the Court cannot find that the ALJ's vague reference to Mr. Coyazo's ability to socialize

adequately explains her apparent rejection of Dr. Emery's opinion regarding Mr. Coyazo's social

limitations.

As the final item in her first set of reasons for the weight she assigned Dr. Emery's

opinions, the ALJ asserted that Mr. Coyazo "was able to … function somewhat outside the home."

(AR 25.) But without further explanation, this assertion is also too vague to adequately explain the

ALJ's apparent rejection of Dr. Emery's opinion regarding Mr. Coyazo's social limitations.

"[F]unction[ing] somewhat outside the home" could encompass a nearly infinite number of

activities, which might or might not evidence an ability to interact with supervisors and coworkers

usefully and on a sustained basis. Because the Court cannot follow the ALJ's reasoning, this

proffered reason is inadequate. *Cf. Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012)

(holding that remand was not warranted where court could "follow the adjudicator's reasoning"

and "determine that correct legal standards have been applied"). Moreover, there is evidence that

Mr. Coyazo struggled to function socially outside the home even in brief, sporadic interactions.

For example, LCSW Short frequently noted Mr. Coyazo's socially inappropriate behavior at

appointments with her, (AR 554, 556, 558, 560, 562); Dr. Emery recorded Mr. Coyazo's report

that "he gets angry around people, even going to the store" and experiences "panic symptoms …

in situations with a lot of people," (AR 635); and, LCSW Gilkey noted Mr. Coyazo's "frustration

around his appointments with the organization." (AR 855.)

In addition, the Court finds the District of Colorado's reasoning in *Jimenez v. Berryhill* instructive on this point. *See* 300 F. Supp. 3d 1295 (D. Colo. 2018). In *Jimenez*, an ALJ rejected a medical source opinion finding social interaction limitations because the claimant was "generally noted to be pleasant and cooperative during his exams." *Id.* at 1303–04. The *Jimenez* court held that it was improper for the ALJ to rely on the claimant's interactions with healthcare providers without providing "evidence to support his conclusion that the ability to occasionally interact well with medical providers in exams correlates to an ability to interact appropriately with coworkers and supervisors." *Id.* at 1304. The court explained that without such evidence, the ALJ's determination was "mere conjecture," and "'[a]n ALJ cannot substitute her lay opinion for that of a medical professional,' or 'interpose his own 'medical expertise' over that of a physician.'" *Id.* (quoting *Lax*, 489 F.3d at 1089; *Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987)); *see also Hosea v. Saul*, No. 19-cv-0811, 2020 WL 5821029, at *5 (D.N.M. Sept. 30, 2020) (holding that ALJ erred in not explaining why claimant's normal behavior at medical appointments "detract[ed] from the physicians' opinions on his ability to function socially"). Likewise, here, the ALJ failed to provide evidence to support her apparent conclusion that an ability to function somewhat outside the home "correlates to an ability to interact appropriately with coworkers and supervisors." *Jimenez*, 300 F. Supp. 3d at 1304.

More broadly, the ALJ's treatment of Dr. Emery's opinions is also deficient because she "never offered an adequate explanation for why [she] translated Dr. [Emery's] marked to moderate limitation in interacting with coworkers, supervisors, and the general public into occasional contact with coworkers and supervisors and … no contact with the public." *Armijo v. Berryhill*, No. 16-cv-1001, 2018 WL 1175091, at *6 (D.N.M. Mar. 6, 2018). This omission is particularly problematic because there is significantly probative evidence suggesting that Mr. Coyazo would

have *more* difficulty interacting with coworkers than with the public, not less. Specifically, Mr. Coyazo testified that, before he stopped working, he was reprimanded for getting into a physical altercation with a coworker. (AR 45-46.) Yet the ALJ failed to explain why she discounted this evidence in weighing Dr. Emery's opinions. "Without a narrative explanation, the Court is unable to follow the ALJ's reasons for concluding that [Mr. Coyazo] should have … no contact with the public, but was still able to maintain occasional contact with coworkers and supervisors." *Armijo*, 2018 WL 1175091 at *6. For all of the foregoing reasons, the ALJ did not adequately explain her apparent rejection of Dr. Emery's opinion regarding Mr. Coyazo's social limitations.

The ALJ also failed to adequately explain her apparent rejection of Dr. Emery's opinion regarding Mr. Coyazo's adaptive limitations. In this regard, the ALJ first stated that Mr. Coyazo "was assessed with essentially normal mental status upon examination on multiple occasions." (AR 25.) However, the record also includes uncontroverted evidence that Mr. Coyazo's providers made abnormal mental status exam findings on numerous occasions, and that Dr. Spies and Dr. Emery did as well. Specifically:

- In December 2013, Dr. Spies observed that Mr. Coyazo could recall only one of three words after three minutes and could not recall the United States Vice President's name, and that his mood was "excited," (AR 476);

- In October 2014, Dr. Cone noted Mr. Coyazo's positive depression screen, (AR 539);

- In January 2016, LCSW Short observed Mr. Coyazo's attention-seeking, seductive, ingratiating behavior, depressed mood, and depressed, tearful affect, (AR 562);

- In February 2016, LCSW Short observed Mr. Coyazo's ingratiating, seductive, condescending behavior and tangential, preoccupied thought, (AR 558, 560);

- In March 2016, LCSW Short observed Mr. Coyazo's depressed mood, restricted affect, tangential and perseverative thought content, incongruent and poor perceptions, judgment, insight, and overly familiar behavior, (AR 554, 556);

- In October 2016, LCSW Gilkey observed Mr. Coyazo's depressed, anxious mood, (AR 857);

- In November 2016, LCSW Gilkey observed Mr. Coyazo's distracted attention, pressured speech, and depressed mood, (AR 852, 853, 855);

- In January 2017, LCSW Gilkey observed Mr. Coyazo's pressured speech, and in February 2017 she observed his pressured speech and disheveled appearance, (AR 839, 842, 845);

- In March 2017, Dr. Emery observed Mr. Coyazo's "mild to moderate" "[m]anifest anxiety," "frequent tangents … perseveration … and pauses," inability to recall objects after three minutes, what he ate night before, or his mother's birthday, mistakes counting by twos, multiplying single digits, performing serial sevens, and identifying the number of weeks in the year and the capital of Italy, and problems with abstraction, (AR 635-36);

- In March 2017, LCSW Gilkey observed Mr. Coyazo's distracted attention, pressured speech, depressed mood, and fair judgment and insight, (AR 835, 838);

- In April 2017, LCSW Gilkey observed Mr. Coyazo's depressed, irritable, and agitated mood, (AR 880, 881);

- In May 2017, LCSW Gilkey observed Mr. Coyazo's irritable, depressed, and fearful mood and fair judgment, (AR 877, 879);

- In June 2017, LCSW Gilkey observed Mr. Coyazo's distracted attention, tangential speech, depressed mood, and fair self-control, judgment, and insight (AR 872, 874);

- In June 2017, Dr. White observed Mr. Coyazo's unkempt appearance, limited, flat affect, anxious, depressed, apathetic mood, loose thought process, and fair self-concept, judgment, and impulse control, (AR 827);

- In July 2017, Dr. White observed Mr. Coyazo's depressed mood and dysphoric affect, (AR 832);

- In August 2017, LCSW Gilkey observed Mr. Coyazo's restless motor activity and depressed mood, (AR 862); and,

- In August 2017, Dr. White observed Mr. Coyazo's pressured speech, and in August and December 2017, he observed Mr. Coyazo's fair perception, insight, judgment, and impulse control, (AR 829, 831).

The ALJ failed to explain why she apparently discounted this evidence in rejecting Dr. Emery's

opinion that Mr. Coyazo is markedly limited in his ability to plan, respond to changes, deal with

stress, maintain safe behavior, follow rules, and adhere to a schedule usefully and on a sustained basis. (AR 25.)

The ALJ next explained the weight she assigned Dr. Emery's opinions by stating that Mr. Coyazo "report[ed] that he was completing projects." (AR 25.) The record includes two references to Mr. Coyazo reporting that he was completing projects, made by LCSW Gilkey on August 9 and 16, 2017. (AR 807, 861.) These two references stand in contrast to numerous references in the record to Mr. Coyazo's struggles to complete even simple tasks, including that:

- In February 2016, LCSW Short observed that Mr. Coyazo "had difficulty when making lists and establishing priorities" and "became overwhelmed [and] confused," (AR 560);

- In March 2016, Mr. Coyazo reported that he had "left burners on" and could only pay attention for "10 minutes or so," (AR 383, 387);

- In April 2016, Dr. Jeansonne noted Mr. Coyazo's report that he was unable to concentrate or focus, (AR 552);

- In July 2016, Dr. Lieberman observed "some hesitancy in [Mr. Coyazo's] speech pattern" and that "he did at one point forget what he had been talking about" and "forgot to take his medications this morning," (AR 658-60);

- In March 2017, Dr. Emery noted Mr. Coyazo's report "that he has left stove burners on after he was done cooking and worries about that," (AR 635);

- In March 2017, LCSW Gilkey noted Mr. Coyazo's reports of unfinished projects and trouble keeping up with his thoughts and that he could not "get up and do the things he wants to do," (AR 835, 838);

- In May 2017, Dr. Jeansonne noted Mr. Coyazo's report that he had "more issues with completing tasks" and "has left stove/faucet on at times," (AR 646);

- In June 2017, LCSW Gilkey observed that Mr. Coyazo "misremembers things and ends up missing appointments," (AR 874);

- In July 2017, Dr. White noted Mr. Coyazo's report of trouble focusing, (AR 832);

- In September 2018, Mr. Coyazo testified that there have been occasions on which he pulled over while driving because he did not remember how to get home, that he sometimes forgot

whether he had taken his medications, and that with "[e]ven the simplest tasks, keeping [his] house in order, [his] paperwork, … everything just jarbles," (AR 52-53, 56);

- In September 2019, Dr. Cone recorded that Mr. Coyazo had been "referred to [a] rheumatologist in 2016 but forgot the app[ointment] and did not go," (AR 900); and,

- In September 2020, Mr. Coyazo testified that there had been several occasions on which he forgot to turn off a burner and returned home to find "nothing but smoke," and several occasions on which he forgot to turn off a faucet until "the water ran over the side of the sink and down into the basement," (AR 97).

In weighing Dr. Emery's opinions, the ALJ failed to explain why she discounted this extensive record evidence in favor of two reports of completing projects in August 2017. (AR 25.)

Finally, the ALJ supported the weight she gave Dr. Emery's opinions by stating that Mr. Coyazo reported "feeling more clear mentally." (AR 25.) Based on the ALJ's accompanying citation to the record, this appears to be a reference to Dr. Jeansonne's July 3, 2017, note that Mr. Coyazo "fe[lt] mentally more clear" following a change in his lactulose dose. (AR 640 (12F/2).) However, even assuming increased mental clarity achieved six months before the end of a six-year adjudicative period could demonstrate adaptive function across the entire period, evidence that Mr. Coyazo felt mentally clearer in July 2017 fails to contradict Dr. Emery's opinion regarding Mr. Coyazo's adaptive limitations, because it does not indicate whether Mr. Coyazo felt clear enough to usefully perform and sustain adaptive functions in a work setting.

In addition, the ALJ failed to explain why she discounted significantly probative evidence that Mr. Coyazo continued to experience symptoms likely to limit his adaptive functioning after July 3, 2017. On July 10, 2017, Mr. Coyazo presented to Dr. White with depressed mood and dysphoric affect and reported "[t]rouble focusing, emotional liability, [and] insomnia." (AR 832.) And after Mr. Coyazo canceled appointments on July 12 and 28, 2017, and failed to attend an appointment on August 2, 2017, (AR 863, 865-66), LCSW Gilkey "confronted [him] regarding his tendency to avoid therapy during states of depression and attend when he felt well" and

"explored [his] depression over the previous weeks." (AR 862.) For these reasons, the ALJ did not adequately explain her apparent rejection of Dr. Emery's opinion that Mr. Coyazo's overall adaption was markedly impaired.

## IV. CONCLUSION

An ALJ must provide adequate reasons for the weight she gives a medical source opinion. *Frantz*, 509 F.3d at 1302-03; *Oldham*, 509 F.3d at 1258; *Haga*, 482 F.3d at 1207-09; *Givens*, 251 F. App'x at 568. Here, in assessing Mr. Coyazo's RFC, the ALJ did not adequately explain her failure to account for Dr. Spies' opinion that Mr. Coyazo is moderately limited in the ability to carry out simple instructions. In addition, the ALJ failed to adequately explain her apparent rejection of Dr. Emery's opinions that Mr. Coyazo is moderately to markedly limited in the ability to function socially and markedly limited in the ability to adapt. As such, the Court cannot determine whether the ALJ properly evaluated these consultative examiners' opinions and whether her rejection of their opinions was supported by substantial evidence.[20] Remand is therefore warranted, *Jensen*, 436 F.3d at 1165, and Mr. Coyazo's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 21) is GRANTED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

[20] Additionally, although the Commissioner has not argued harmless error regarding the ALJ's treatment of the opinions discussed herein, (*see generally* Doc. 25), the Court notes that Dr. Spies and Dr. Emery opined to greater limitations than the ALJ's RFC appears to accommodate. Thus, had the ALJ properly weighed the examiners' opinions regarding Mr. Coyazo's impairments, she may have given them greater weight and thereby assigned Mr. Coyazo a more restrictive RFC. In this regard, the Court notes the VE testimony in the record that needing frequent or consistent reminders to carry out tasks, or being unable to respond appropriately to supervisors or coworkers, would result in progressive discipline or termination and eliminate competitive employment. (AR 74-75, 111.) Thus, the ALJ's errors were not harmless. *Cf. Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014) (failure to provide adequate reasons for rejecting a medical source opinion "involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of [RFC]").